IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 18-CV-80305-WPD

KENNETH WOLINER, M.D.,

       Plaintiff,

  vs.

MARTHA SOFRONSKY, KRISTEN
SUMMERS, LOUISE WILHITE ST. LAURENT,
and LUCY GEE,

       Defendants.

- - -

North Palm Beach, Florida
Friday, October 19, 2018
10:03 a.m. - 12:56 p.m.
1:30 p.m. - 3:05 p.m.

- - -

DEPOSITION

OF

KENNETH WOLINER, M.D.

```
 1   APPEARANCES:

 2     ON BEHALF OF THE PLAINTIFF:

 3          KENNETH WOLINER, M.D., PRO SE
            23086 Island View Drive
 4          Number 6
            Boca Raton, Florida 33433
 5          BY:  KENNETH WOLINER, M.D., PRO SE

 6     ON BEHALF OF MARTHA SOFRONSKY:

 7          TAYLOR LAW GROUP, LLC
            1806 North Flamingo Road
 8          Suite 322
            Pembroke Pines, Florida 33028
 9          BY:  BRODERICK TAYLOR, ESQ.

10     ON BEHALF OF KRISTEN SUMMERS,
       LOUISE WILHITE-ST. LAURENT, and LUCY GEE:
11
            WILLIAMS, LEININGER & COSBY, P.A.
12          11300 U.S. Highway One
            Suite 300
13          North Palm Beach, Florida 33408
            BY:  JAMES O. WILLIAMS, JR., ESQ.
14
       ALSO PRESENT:
15     (Appearing by telephone)

16          KRISTEN SUMMERS
            LOUISE WILHITE-ST. LAURENT
17          LUCY GEE

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2
     WITNESS                    Direct Cross Redirect  Recross
 3
     KENNETH WOLINER, MD.
 4
     By Mr. Williams                4
 5

 6

 7                     E X H I B I T   I N D E X

 8
     NUMBER              DESCRIPTION                PAGE
 9
     Defendant's 1    March 13, 2015 letter         66
10   Defendant's 2    Election of Rights            67
     Defendant's 3    Election of Rights            68
11   Defendant's 4    Respondent's Proposed         69
     Defendant's 5    Respondent's Exceptions       70
12   Defendant's 6    Notice of Hearing             71
     Defendant's 7    Notice of Appeal              73
13   Defendant's 8    Appellant's Initial Brief     73
     Defendant's 9    Appellant's Reply Brief       77
14   Defendant's 10A  Photo                        102
     Defendant's 10B  Photo                        102
15   Defendant's 10C  Photo                        102
     Defendant's 11   December 4, 2011 letter      131
16   Defendant's 12   August 23, 2011 letter       133
     Defendant's 13   November 14, 2011 letter     136
17   Defendant's 14   Letter                       137

18

19

20

21

22

23

24

25
```

```
 1          The deposition of KENNETH WOLINER, M.D. was taken
 2   before me, Melanie Wustrau, RMR-CRR, Notary Public, State of
 3   Florida at Large, at 11300 U.S. Highway One, North Palm Beach,
 4   Florida, on Friday, October 19, 2018, beginning at 10:03 a.m.
 5   pursuant to the notice in said cause for the taking of said
 6   deposition, which is attached to the Court file herein, at the
 7   instance of the Defendants, Kristen Summers, Louise Wilhite-St.
 8   Laurent, and Lucy Gee in the above-entitled cause pending in
 9   the above-named Court.
10   THEREUPON,
11                       KENNETH WOLINER, M.D.
12   being by me first duly sworn to tell the whole truth, as
13   hereinafter certified, testified as follows:
14                         DIRECT EXAMINATION
15        Q.   (BY MR. WILLIAMS)  Would you state your full
16   name for the record, please, sir.
17        A.   It's Dr. Kenneth Woliner.
18        Q.   And, Dr. Woliner, you're the plaintiff in the
19   case that has been filed against my clients, Kristen
20   Summers, Louise Wilhite-St. Laurent, and Lucy Gee; is that
21   right?
22        A.   Yes.
23        Q.   What's your current residence address, sir?
24        A.   23086 Island View, No. 6, Boca Raton, 33433.
25        Q.   And how long have you lived at that address?
```

1  sent it but we sent multiple different things to the
2  Department of Health, we complied with that.
3       **Q.**   You claim in your lawsuit that my clients were
4  involved in a conspiracy to violate your civil rights; do
5  you recall that?
6       **A.**   Yes.
7       **Q.**   What is it that my clients supposedly conspired
8  to do?
9       **A.**   Your clients, St. Laurent and Summers, took an
10 audio recording that had exculpatory evidence on it,
11 including comments where over two hours that there's a
12 discussion between myself and Martha Sofronsky about how
13 her daughter was diagnosed with cancer at five different
14 treatment centers, and how that she was referred to a
15 cancer oncologist and how they decided to not pursue that.
16 That information was on that audio recording.
17          That St. Laurent and Summers destroyed that
18 audio recording by discarding the only copy of it when
19 they had a statutory obligation to preserve it for five
20 years.
21          That when my attorney, David Fursteller,
22 attempted to get that recording by making a public record
23 request/evidence request/preservation letter, St. Laurent
24 negligently or fraudulently told Fursteller we have no
25 duty to preserve that evidence or public record, we have

1  no duty to reacquire that evidence or public record,
2  which, unfortunately, Mr. Fursteller relied upon and
3  didn't pursue further.
4         When I tried to obtain that public record on
5  June 12th through September 14th with multiple attempts;
6  that multiple employees at the Department of Health,
7  instead of even looking at the Statute 119.011 of what a
8  public record is or any other responsibility it had, they
9  stonewalled and prevented me from getting access to it.
10 They didn't even attempt to contact Mrs. Sofronsky when
11 the recording might have been able to be found before it
12 was lost completely and lost permanently and because of
13 that, the actions of St. Laurent and Summers, as well as
14 other people at the Department of Health, of not providing
15 that public record made it so I couldn't be able to prove
16 to the Board of Medicine at the exception phase or the
17 First DCA at the appellate phase that that tape recording
18 was not a true indication of what happened during that
19 April 29th, 2013 bereavement session.
20         All the other things that go along with that, of
21 the damage to my reputation and career, to my business,
22 are related to that conspiracy.
23         Now, there could be reasons for that and that's
24 part of discovery, to figure out whether it be reasons
25 that St. -- that she didn't like someone attacking her

1   fiefdom for the last 24 years.  It could be that St.
2   Laurent wanted to be able to get promoted and she's now
3   interim general counsel.  That Summers wanted to be
4   promoted and she now has a higher paid position too.
5   There could be multiple reasons for them to do this.  But
6   that conspiracy between multiple people to the time we
7   have due process is actionable and I'll pursue it.
8        **Q.**   What is it that it is that you believe is the
9   object of this conspiracy?
10       **A.**   Well, that sounds like a legal conclusion, so
11  I'm not really sure what you're describing.  So if there's
12  a specific term that you're using that a term of art, I'm
13  not sure if I understand what you're asking.
14       **Q.**   Sir, it's very simple.  You've claimed in your
15  lawsuit that there is a conspiracy.  My question for you
16  is, a conspiracy to do what?
17       **A.**   Well, a conspiracy could have multiple, we'll
18  say, goals or multiple effects.  One goal of covering up
19  the recording by destroying, not just concealing, but
20  destroying evidence, destroying public records is it makes
21  it harder for St. Laurent or Summers to be disciplined for
22  what they did.  It makes it easier for them to get
23  promoted.  So there's goals for benefitting themselves.
24           But as for goals of harming me?  Well, I could
25  see how either Gee or St. Laurent or Summers or anyone

1  else could respond to the complaints I filed against other
2  healthcare practitioners in a way to be able to go after
3  me with great zeal and so those are two goals of a
4  conspiracy right there.
5      **Q.**   Do you have any evidence that suggests that Ms.
6  Gee was involved in any conversation with Ms. Summers or
7  Ms. St. Laurent about a conspiracy against you?
8      **A.**   When your law firm stops opposing my discovery
9  requests, I'll have that evidence.
10     **Q.**   Do you have any evidence, as we sit here today,
11 to support the idea that Ms. Gee was involved in any
12 discussions with either Ms. St. Laurent or Ms. Summers
13 about a conspiracy against you?
14     **A.**   The evidence I have are these blank e-mails that
15 are whited out and blacked out and inference from them is
16 that there's something on there that they don't want me to
17 see.
18     **Q.**   You made a comment a few moments ago that Ms.
19 Summers and Ms. St. Laurent not only concealed but
20 destroyed evidence.  Do you remember that?
21     **A.**   Yes, I did.
22     **Q.**   What evidence are you aware of that they
23 destroyed any evidence?
24     **A.**   The April 29th audio recording.  It was only on
25 that MP3 recording device.  They had a statutory duty, not

1   even that, a constitutional duty to preserve that for five
2   years.  That recording was used by them and background
3   material at the very minimum, as well as being used during
4   the hearing and by public records standpoints they are
5   required to keep it for five years and they didn't.  They
6   didn't.  And in every cop show on TV, you can't take the
7   gun and throw it away.  You can't throw away evidence, and
8   that's what they did.  By giving evidence to someone that
9   had no duty to preserve it is the same thing by giving it
10  to your friend, hide this for me so you don't hide it
11  yourself.  And they destroyed evidence.
12      **Q.**   You know that what happened was that the
13  recording was given back to its owner, Ms. Sofronsky;
14  right?
15      **A.**   Actually, the recording device might be owned by
16  Mrs. Sofronsky but the recording itself became a public
17  record and the recording, I am clear on, had to be either
18  kept or a copy to be kept for five years and that nothing
19  that you are going to say here is going to change what the
20  Florida Constitution, the Florida Statutes what they say
21  or what Judge Blanc said.
22      **Q.**   You're aware that all that happened was that the
23  recording device with the recording on it was given back
24  to Ms. Sofronsky; correct?
25      **A.**   No, the recording device carrying a public

1  record that was required to be kept for five years and
2  that the evidence that was used in a trial and used back
3  for trial was discarded and destroyed.  And you might say
4  the word given, I could say I could give something in to a
5  dumpster and throw it in but the thing is it's still
6  thrown away.
7       **Q.**   You know that this wasn't put into a dumpster,
8  don't you?
9       **A.**   This was given to someone that had no statutory
10 control or responsibility to preserve it and by doing what
11 they did is that they broke the law.  They broke the law.
12 At the very minimum, it's a misdemeanor in Chapter 119.
13 They broke the law.
14      **Q.**   You know that they did not destroy evidence,
15 don't you?
16      **A.**   No, I do not know that.  And so we can go back
17 and forth and so this will be the last time I'm going to
18 answer your question and you can either move on or we can
19 be able to adjourn for another thing and I will file a
20 motion for protective order because this is harassment at
21 this point.
22      **Q.**   Do you have any evidence that anything was done
23 with this recording device and the recordings on it other
24 than giving it back to Ms. Sofronsky?
25      **A.**   I have evidence that they listened to that

1  recording from start to beginning where Ms. St. Laurent
2  described in an e-mail to my attorney that she heard Ms.
3  Sofronsky enter the reception area, get greeted by staff,
4  talked with them, walked back to my office and had a
5  conversation with me.  And so with that said, yes, there
6  was other things done, that that recording was used in
7  multiple different ways, used for the trial, and thrown
8  away, discarded, destroyed and these are things that your
9  clients did, and with that said, that's what I know.
10      Q.   When you used the term "thrown away, discarded
11 or destroyed," you're referring to my clients returning
12 the device to Ms. Sofronsky, aren't you?
13      A.   At this point, I'd like to adjourn to be able to
14 file a motion for protective order.  I think that you are
15 harassing me at this point and at this point I'm not -- I
16 think that you're just asking the same thing over and over
17 and over again to try to get a different response.  These
18 are asked and answered and I think that we're done.
19      Q.   So you're terminating the deposition at this
20 point, Doctor?
21      A.   I'll give you the opportunity to move on to
22 another subject.
23      Q.   I want you to answer the question that I have
24 asked, which is, do you have any evidence that my clients
25 did anything other than return the MP3 device and the

```
 1  recording on it to Ms. Sofronsky?
 2       A.   Yes, I do.
 3       Q.   What is that?
 4       A.   In addition to all the things you just said is
 5  that St. Laurent told Mr. Fursteller by e-mail that she
 6  had no duty to preserve that evidence, no duty to
 7  reacquire it and that was a lie.  That was untrue.  That
 8  is not what the law says.  That covered things up.
 9            With this said, your clients have done other
10  things besides just give something innocently to someone
11  else.  And with this said, I think I've answered your
12  question.
13       Q.   What other evidence do you have of what my
14  clients have done?
15       A.   I'm going to adjourn this meeting.  I'd like to
16  be able to put on the record that I'm going to adjourn
17  this meeting.  I'll file a motion for protective order.
18       Q.   To be clear, Doctor, before you leave, if you
19  require us to come back and spend additional time and
20  monies, we'll seek relief from the court.  Do you
21  understand?
22       A.   Sure.
23       Q.   So you're terminating the deposition?
24       A.   I'm terminating the deposition because you're
25  harassing me.
```

```
1            MR. WILLIAMS:  I'll take it.
2            DR. WOLINER:  I'll read.
3            (At 3:05 p.m., the deposition adjourned.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```